1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF OREGON

9                          PORTLAND DIVISION

10

KIMBERLY DEINLEIN                    )
11        an individual,             )
                                     )
12                  Plaintiff,       )    No. CV-10-118-HU
                                     )
13        v.                         )
                                     )
14   Commissioner of Social          )    FINDINGS AND RECOMMENDATION
     Security,                       )
15                                   )
                    Defendant.       )
16   _____)

17

18   James S. Coon
     SWANSON THOMAS & COON
19   820 S.W. Second Avenue, Suite 200
     Portland, OR 97204
20        Attorney for Plaintiff

21

     Adrian Brown
22   U.S. ATTORNEY'S OFFICE
     District of Oregon
23   1000 S.W. Third Avenue, Suite 600
     Portland, OR 97204
24

     Jordan Goddard
25   SOCIAL SECURITY ADMINISTRATION
     Office of the General Counsel
26   701 Fifth Avenue, Suite 2900, M/S 221A
     Seattle, WA 98104
27        Attorneys for Defendants

28

HUBEL, Magistrate Judge:

Plaintiff Kimberly Deinlein brings this action pursuant to section 405(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of the Commissioner denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). On appeal, Deinlein asks that the court reverse the decision of the Comissioner and remand for further development of the record. I recommend reversing the decision of the Commissioner and remand for further development of the record and reconsideration by an ALJ.

**DISABILITY ANALYSIS**

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one

2 - FINDINGS AND RECOMMENDATION

of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform his or her past work, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence, but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences

3 - FINDINGS AND RECOMMENDATION

1  reasonably drawn from the record, and if evidence exists to support
2  more than one rational interpretation, we must defer to the
3  Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193
4  (9th Cir. 2003) (internal citations omitted). Thus, the question
5  before the court is not whether the Commissioner reasonably could
6  have reached a different outcome, but whether the Commissioner's
7  final decision is supported by substantial evidence. See
8  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

9  **THE ALJ'S DECISION**

10  In a September 25, 2007 opinion, the Administrative Law Judge
11  ("ALJ") found that Deinlein suffered from the severe impairment of
12  bipolar disorder. The ALJ found that Robinson had the residual
13  functional capacity ("RFC") to perform a full range of work at all
14  exertional levels, but with the following nonexertional
15  limitations: She is limited to simple, repetitive work. She is
16  further limited to occasional interaction with the public, however
17  she can engage in brief and structured interaction. Based on the
18  above limitations the ALJ concluded that Deinlein could work as a
19  house cleaner, a small products assembler, or a hand packager.

20  In arriving at this conclusion, the ALJ relied primarily on
21  the treatment records of Larissa Jeffreys, which contained
22  references to Deinlein's work with her husband. The ALJ did not
23  delve into the records of Dr. Thomas Passmore in the record at the
24  hearing, which were largely illegible. The ALJ did not have an
25  opportunity to consider Dr. Passmore's records which covered time
26  periods both after the hearing and after he issued his decision.
27  Nor did the ALJ have the benefit of considering the treatment
28  records of Kim Delaney, who treated Deinlein from 1996-2003. The

4 - FINDINGS AND RECOMMENDATION

ALJ found that Deinlein's subjective symptom testimony was not entirely credible, due to her references to working with her husband and due to a discrepancy about how often and how far she walked.

**FACTS**

Deinlein was 40 years old on the alleged onset date of December 14, 2003. Her last date insured was December 31, 2006. She originally alleged disability due to bipolar disorder, hypertension, hyperthyroidism, and hypercholesterolemia.   On appeal, however, the only issue  is whether Deinlein's bipolar makes her unable to work.   Deinlein alleges that her bipolar disorder is what prevents her from working, because her "moods cycle rapidly. Tr. 218. [She] become[s] too depressed to work or too manic to concentrate on work to the point that [she] could [*sic*] complete it."  Tr. 218.

She has post secondary education in a vocational school and is licensed as a dental assistant.  Tr. 291.  She has worked in the past as an oral surgery technician. Tr. 219.   She also occasionally helps her husband with his aquarium design and maintenance business.  Tr. 291.

According to Deinlein, on a typical day, she wakes up at 10 a.m., showers, and has breakfast.  Tr. 171.  She does light housework from 11-1, and takes a nap from 1-2:30.  She takes care of her child from roughly 3-9 p.m., and makes dinner perhaps twice per week.  She goes to bed at 9:30 p.m. Deinlein has a cat that she feeds and grooms.  Tr. 172.  She makes lists of chores, and does laundry for the family.  Tr. 173.  Twice per week, Deinlein will engage in sewing and making ceramics, her hobbies of choice.

5 - FINDINGS AND RECOMMENDATION

1  Tr. 175.  She does not drive.  Tr. 176.  She can walk 6-7 blocks
2  without taking a break to rest.  Tr. 176.  She is 5' 6" tall and
3  weighs 187 lb.  Tr. 217.  She is married and has a teenage son.

4        On December 23, 2003, Deinlein established care with internist
5  Dr. Heather Paladine at the Richmond Family Health Center.  Tr.
6  269.  At that appointment Dr. Paladine noted that Deinlein had a
7  past medical history of bipolar disorder that "is followed by
8  Larisa Jeffreys, psychiatric nurse practicioner."  Tr. 269.  Dr.
9  Paladine opined that her bipolar disorder "appears to be stable for
10 now."  Tr. 270.

11       On January 21, 2004, Deinlein reported to Dr. Paladine for a
12 physical exam.  Tr. 267.  Dr. Paladine noted that Deinlein has a
13 history of bipolar disorder, hypothyroidism, hypertension, and
14 hyperlipidemia.  Tr. 267.  To treat her mental illness, Deinlein
15 took Wellbutrin, Lithium, and clonazepam.  Tr. 267.  At that time,
16 Deinlein denied smoking, alcohol, or drug use.  Tr. 267.  Dr.
17 Paladine wrote, "She eats healthy and walks 3 to 4 times a week."
18 Tr. 267.

19       According to Deinlein, she has taken several different
20 medications over the years to treat her bipolar.  Tr. 248.  In
21 1998, she took Lithium and Wellbutrin to treat her bipolar.  In
22 2001 she took Zyprexa for her bipolar.  Tr. 248.  In 2006, Dr.
23 Thomas Passmore, D.O. presribed Seroquel to address "anxiety and
24 rapid cycling episodes."  Tr. 248.

25       Deinlein established care with Larissa Jeffreys, Professional
26 Mental Health Nurse Practitioner, in Portland, Oregon, on January
27 22, 2004.  At her intake appointment, Jeffreys noted that Deinlein
28 had a history of impulsivity and a family history of suicide,

6 - FINDINGS AND RECOMMENDATION

although her current suicide risk was low.  Tr. 293.  She described to Jeffreys "a long history of mood lability = periods of depression and mania, meeting criteria for bipolar."  At that time, Deinlein was "well controlled on her current [medications]," which included Eskalith, Wellbutrin, and clonazepam.  Deinlein reported "significant occupational stress," associated with being self-employed and running an aquarium maintenance business with her husband, and parenting.  Jeffreys also noted that she needed to communicate with the primary care physician about olfactory hallucinations and headaches that Deinlein had developed over the past six months.  Jeffreys diagnosed Deinlein with Bipolar I Disorder and assessed her with a GAF score of 65.  Jeffreys recorded that Deinlein had an extensive family history of bipolar disorder, that she had been hospitalized when she was 19 for depression, and again when she was 22 for a suicide attempt.  Tr. 292.

On March 31, 2004, Deinlein reported to Jeffreys "feeling in a hypomanic period," and that she "has only been sleeping 3-4 [hours] per night."  Tr. 290.  Jeffreys observed that Deinlein "sounds slightly giddy."  Jeffreys instructed Deinlein to taper off the Wellbutrin.

On April 21, 2004, Deinlein followed up with Jeffreys, reporting that she had completely tapered of the Wellbutrin, that her mood was "pretty even," but that she "still has days when I'm a little hypomanic."  Tr. 290.  She told Jeffreys that she was "overwhelmed" while involved in her husband's "brisk business."  Id. Deinlein noticed she had "rapid speech and racing thoughts," as well as increased irritability.  Jeffreys wrote that her objective

7 - FINDINGS AND RECOMMENDATION

observation was that Deinlein did have a slightly rapid speech rate.  Jeffreys prescribed Lamictal.

On May 26, 2004, Deinlein reported that things were "ok overall" since starting the Lamictal, but that her sleep had still been poor in the previous week and a half.  Tr. 289.  Deinlein said the hypomanic symptoms were "not nearly as bad."  Jeffreys prescribed Ambien for intermittent use.

On July 7, 2004, Deinlein saw Jeffreys and related that she was experiencing some "mild rapid cycling," but that the Lamictal was helping and that her "down moods" were now lasting only for about two hours, as opposed to a week at a time.  Tr. 288. Deinlein reported that she was "so busy [with] work[1] responsibilities that self-care is suffering."  Jeffreys wrote that her objective observation was that Deinlein's "mood [was] mildly dysthymic," and that she "appear[ed] tired."  Tr. 288.

On August 11, 2004, Deinlein missed her appointment.  Tr. 288.

On August 23, 2004, Deinlein went to see Jeffreys again, and reported that she was "doing ok, but still stressed and not pushing her [her]self too hard."  Tr. 288.  She was "still ruminating and noting more teeth clenching and tension headaches."  Jeffreys observed that Deinlein's "mood remains anxious."

On October 12, 2004, Deinlein spoke on the phone with Jeffreys and stated that "the periods of depression seem 'about the same' as they did [on August 23] visit, but . . . they're less severe and lasting only 1-2 days" at a time.  Tr. 287.

---

[1] This July 7, 2004 note regarding "work" is seven months after Deinlein's alleged onset of disability.

8 - FINDINGS AND RECOMMENDATION

1    On November 15 and 17, 2004, Deinlein cancelled her

2  appointments.  Tr. 287.

3    On November 29, 2004, Deinlein saw Jeffreys in person and told

4  her she had been "doing some rapid cycling during [the] past few

5  weeks," and that she had been both manic and depressive on the same

6  days.  Tr. 287.  Deinlein also told Jeffreys that her mother was

7  entering the later stage of cancer.  Deinlein continued to use the

8  clonazepam to control her rapid cycling.  Jeffreys observed that

9  her mood was sad, and that her affect was more constricted than in

10  previous visits.  Jeffreys prescribed Resperdal to help stabilize

11  Deinlein's moods more effectively.  Tr.

12    Deinlein missed her December appointment because her mother

13  was in the intensive care unit at the hospital.  Tr. 286.

14    On January 11, 2005, Deinlein visited with Jeffreys and

15  reported that she had felt groggy in recent weeks and wondered if

16  it was related to her new prescription for Resperdal.  Tr. 286.

17  Deinlein also reported that "she's not sleeping enough due to

18  insomnia," and sleeps only four and a half hours per day.  Tr. 286.

19  She was waking up at 4 a.m. and related that she was having more

20  rumination and irritability, as well as increased distractibility.

21  Jeffreys observed that Deinlein's mood was "anxious and dysthymic."

22    On February 8, 2005, Deinlein went to see Jeffreys and

23  reported that she "goes back and forth between days where she is

24  'ok' [and] days where thoughts are racing and [she] is only

25  sleeping 4-5" hours per night.  Tr. 285.  Jeffreys observed that

26  Deinlein's "mood/affect appear euthymic although [patient] reports

27  significant [depression]."  She concluded that Deinlein's mood

28  "remains labile," meaning that she was experiencing "mixed

9 - FINDINGS AND RECOMMENDATION

depression and hypomania."

On February 15, 2005, Deinlein left a voicemail for Jeffreys stating that her "mood lability is no better" and that she was sleeping a maximum of 5-6 hours per night. Tr. 285. She reported "racing thoughts, ruminative thoughts," and clenching and grinding her teeth. The following day, February 16, 2005, Jeffreys and Deinlein spoke on the phone and Jeffreys advised her client to stop the Resperdal, and begin taking Zyprexa. On February 21, the two spoke by phone again, and Deinlein reported "doing a lot better during the daytime, but still waking 4-5 [times] each [night]." Deinlein continued "to feel groggy during daytime, but [she was] not sure whether it's [due to] disturbed sleep or [medication]."

On February 23, 2005, Deinlein reported to Jeffreys that she was sleeping a little bit better, but was functioning much better during the day. Tr. 284. Deinlein said she was "concentrating better [and] completing projects better." She said, "I like the way things are going with the meds right now," because she was experiencing less racing thoughts, less hyperactivity, and her level of irritability was significantly improved. All of these improvement occurred in spite of her mother undergoing chemotherapy during that period. Jeffreys advised her client to increase the dosage of Zyprexa and keeping using Ambien as needed.

On March 7, Deinlein and Jeffreys spoke by phone and Deinlein reported that her sleep continued to improve, but that now she was too low energy during the daytime. Tr. 284. She also said that her mood was mildly depressed. Jeffreys opined that "this may be a 'coming down phase [after] being hypomanic for so long."

On March 16, 2005, Deinlein saw Jeffreys again and related

10 - FINDINGS AND RECOMMENDATION

that she has "good days and bad days." Tr. 284. She said her anxiety was better and controlled, but she "feels really slowed down in terms of low energy level and cognitive dullness." Her racing thoughts had dissipated completely, and she was sleeping 8 hours per night. Jeffreys wrote that Deinlein's mood was "more labile than ideal," and that she was experiencing significant side effects from the current dose of Zyprexa. Tr. 283. Jeffreys prescribed a higher dose of Lithium, and a switch from regular Zyprexa to Zyprexa Zydis. Jeffreys told Deinlein not to drive a car when she felt over-sedated.

On March 28, 2005, Deinlein saw Jeffreys and reported that the additional Lithium was helping, and she no longer felt depressed and was not experiencing rapid cycling. Tr. 283. She was still feeling very drowsy, however, and thought it might be a side effect of the new Zyprexa formulation.

On April 7, Deinlein went to see Jeffreys again and reported she was "feeling better—definitely no manic episodes." Tr. 282. She said she hadn't experienced any periods of depression lasting longer than one day, and that she was feeling more alert. Deinlein was feeling happier with her medication regimen. At the same time, she was "exploring grieving issues as [her] mother's health [continued] to deteriorate.

On April 14, 2005, Deinlein want to see Dr. Paladine for a routine checkup. Tr. 361. Deinlein reported feeling better about her medication regimen at the moment. Dr. Paladine observed that "her mood is well controlled."

On April 28, 2005, non-examining psychologist Bill Hennings, Ph.D did a psychiatric review of Deinlein's medical records between

11 - FINDINGS AND RECOMMENDATION

December 2003 and April 2005. Tr. 315. He found that Deinlein suffered from bipolar disorder. Tr. 318. He opined that she suffered mild limitations in her activities of daily living and difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. 325. He wrote, "throughout the [medical record] claimant says that most of her problems/stress comes from increased volume at work with her husband, but that overall she is doing well." Tr. 327. After reciting portions of the Jeffreys records where Deinlein reported doing well, Hennings concluded,

> [Claimant] states that she cannot work due to her bipolar disorder, but she had indicated to her treating providers that she is working for her husbands aquarium design business. [Claimant] does state that she doesn't drive when she is feeling groggy from her psych medications, this is consistent with her providers' notes. [Claimant] and 3rd party both state she is capable of handling money, caring for a house, child with ADD. She makes phone calls to family, goes out in evening with family, goes swimming. She takes pottery classes a few times per week at the community college. She can go shopping, does housework, laundry and prepares meals. [Claimant]'s allegations are partially consistent.

Tr. 327. Hennings also completed a a mental residual functional capacity assessment for Deinlein, and found moderate limitations in Deinlein's ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. Tr. 330.

In her Disability report (undated), Deinlein listed Kimberly Delaney as a treating provider from 1993 to 2004, and as someone who may have records regarding her disability. Tr. 220. In her May 18, 2005 Disability Report - Appeal, Deinlein again raised the issue and asked the agency to get the records giving a new address for Delaney who was then retired. Tr. 195. There is nothing in

12 - FINDINGS AND RECOMMENDATION

the record to demonstrate any effort by the ALJ or anyone else at the agency to develop the record in this regard.

On June 2, 2005, Deinlein went to see Jeffreys and communicated that she "feels sedated." Tr. 281. She was experiencing one day per week of over-energized hypomania, and the other six days per week feeling depressed. She was sleeping 10 hours per day, and still feeling drowsy in the daytime with a very low energy level. Jeffreys observed that Deinlein continued to experience mood lability, and instructed her to begin taking Abilify.

On June 15, 2005, Deinlein saw Jeffreys and reported that her mood was "definitely better" since starting the Abilify, but was experiencing a "buzzing of activity in [her] head" 2-3 times per day. Tr. 281. She did not, however, feel manic and her energy level was improved. She did experience depression intermittently throughout the day. Jeffreys presribed a higher dose of Abilify.

On July 12, 2005, Deinlein missed her appointment.

On July 19, 2005, Deinlein reported to Jeffreys that she feels like she is "on a roller coaster ride" regarding her mother's severe illness. Tr. 280. Deinlein said that the Abilify she was taking had "lifted the fog and total lack of energy" and helped her to have "better focus/concentration." Tr. 280. The Abilify, however, caused Deinlein to grind her teeth and gave her headaches. Tr. 280.

Deinlein established a relationship with psychiatrist Dr. Thomas Passmore, D.O. at OHSU on October 24, 2005, and continued seeing him until at least 2008. Tr. 363. Dr. Passmore's notes from the first year and a half are almost completely illegible, and

13 - FINDINGS AND RECOMMENDATION

contain no complete sentences.    Therefore, the notes below are necessarily incomplete.

At Deinlein's intake interview on October 24, 2005, Dr. Passmore documented that Deinlein "felt manic," that she was hospitalized six months after having a hysterectomy.   Tr. 364. Much of what he wrote was illegible.

On November 7, perhaps of 2005[2], Dr. Passmore saw Deinlein and wrote, "[illegible] better," "feels better," and a number of other illegible things. Tr. 365.  He either prescribed, or continued her prescriptions for Lithium, Klonopin, Prozac, Wellbutrin, and Seroquel.

On December 19, presumably of 2005, Deinlein visited with Dr. Passmore.    Tr. 366.    He wrote, "doing well," "feels good," "depression," "mania," "insomnia," "agitation 3X a week," "otherwise doing much better," and "stable."

On January 3, perhaps of 2006, Deinlein had an appointment with Dr. Passmore. Tr. 367.  He wrote, "doing ok," "feels better," and "sleep ok."  He assessed that she was "stable now," and still taking Lithium and Seroquel.

On January 26, perhaps of 2006, Deinlein saw Dr. Passmore again.  He wrote, "doing better," and "bright affect."  Tr. 368.

On February 6, perhaps of 2006, Deinlein saw Dr. Passmore.  He noted that she was taking Lithium, Wellbutrin, Prozac, and

---

[2] Dr. Passmore almost never wrote the year on his notes. Based on the few times he did write a year and the chronology of the medical records from his office, I have attempted to guess the year.  Wherever the word, "perhaps" is used before the year, the evidence in the record does not definitively establish what year the document was written or the visit took place.

Seroquel.  Tr. 370.  He wrote the words, "feels very hypomanic," "irritable," and "day too much."  Dr. Passmore noted she had "hypomanic" symptoms.  He wrote what looks like an up arrow next to the letters Li, presumably prescribing an increase in Lithium.

On February 23, perhaps of 2006, Deinlein went to see Dr. Passmore.  Tr. 371.  He wrote the words, "feels better," "sleep ok," "depression," and "hypomania," in her chart.  He also wrote, "overall depressed affect," and "continue meds."

On March 22, perhaps of 2006, Deinlein saw Dr. Passmore, and wrote the words, "doing ok," "sleep good," "mania," and "depression."  Tr. 372.  It appears that he prescribed Seroquel, Wellbutrin, and Prozac, although it is equally possible he was noting what she was already taking.

On April 12, perhaps of 2006, Deinlein saw Dr. Passmore, and he wrote the words "feels great," in her chart.  Tr. 376.

On September 14, 2006, Deinlein saw Dr. Passmore and he wrote she "feels hypomanic," and prescribed Zyprexa.  Tr. 374.

On October 12, perhaps of 2006, Deinlein had an appointment with Passmore.  Tr. 369.  He wrote, "day a little better," and "stressed [illegible] sleep."  He also wrote "stressed [illegible] work," and "feels guilty."  He opined that her "angry moods and stress [were] not worse than before– but not better."

On an unspecified date in October of perhaps 2006, Deinlein saw Dr. Passmore again, and he wrote, "feels better," and "more energy," as well as something about "meds for sleep."  Tr. 375.

On April 20, 2006, Deinlein went to see a nutritional specialist, Shannon Rentz, R.D., L.D at OHSU.  Tr. 348.  Deinlein's goal was "to be healthier."  Tr. 349.  Rentz talked with Deinlein

15 - FINDINGS AND RECOMMENDATION

about healthy dieting techniques.    Deinlein told Rentz that she walked her dog daily for half an hour, and swam 4-5 times per week at a community pool.    Tr. 348.    Rentz advised her to continue her exercise regimen.    Tr. 349.

On April 24, 2006, Deinlein went to see internist Dr. Jessica Vorpahl, M.D. at Oregon Health Sciences University to discuss estrogen replacement related to the removal of her ovaries and uterus in 2001.    Deinlein had been taking Estradiol, a female hormone, since then.    Tr. 346.    Dr. Vorpahl, addressing Deinlein's history of bipolar, noted that "She did have one point where she went off the medication and noted that her bipolar symptoms worsened with an episode of mania which required hospitalization. Deinlein was concerned about the potential that any change in her medications might affect her mental status.    After discussing the costs and benefits, the two decided that Deinlein would continue to take Estradiol.    Tr. 347.

On December 21, 2006, Deinlein returned to Dr. Vorpahl to discuss hormone replacement.    Tr. 343.    Dr. Vorpahl noted Deinlein's bipolar disorder and she "currently reports this is fairly well-controlled, has been seeing Dr. Tom Passmore in psychiatry."    Deinlein need her labs checked to determine her lithium levels.

There is a gap in the medical records from December 2006 through August 2007.    During that period, in June 2007, the hearing was held before an ALJ, which is discussed in detail below.    The following information came from medical records dated after the ALJ

held a hearing and issued his decision.[3]   Therefore, the ALJ did not consider the following information in making his decision.  The records were submitted to the Appeals Council on April 17, 2008. Tr. 398.  After considering the records the Appeals Council denied the request for review because the records were from a time period after the ALJ's opinion.  The Appeals Council appears to not have evaluated whether the records shed any light on Deinlein's condition at earlier times or, in particular, the continued variability of her symptoms.

By August 27, 2007, Dr. Passmore had switched to electronic records and his notes became, therefore, easier to interpret, albeit still brief.  Tr. 417.  On that date, Deinlein went in for a visit.  Dr. Passmore wrote, "Pt doing better.  No SI No Se. Sleep improved."  He characterized Deinlein as "stable."  Tr. 417.

On September 10, 2007, Deinlein saw Dr. Passmore.  Tr. 416. He wrote, "Increased stress with husband business. No mania.  Not severely depressed - but down.  Affect congruent."  He discussed coping strategies with her, affirmed that she was under increased stress, and he continued her medication regimen.

On September 18, 2007, Dr. Passmore wrote, "Doing much better. More organised - bright affect.  Not depressed or manic.  No SI. Decrease worry of husband's change in [employment].  Discussed coping–and fear of flying to help friend return from UT.  Stable."

_____

[3] The court has considered the records submitted to the Appeals Council, but not the ALJ, in reaching its decision.  When additional material has been submitted to, and considered by, the Appeals Council after the ALJ has issued a decision, it is proper for a reviewing court to consider the additional material. Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993).

17 - FINDINGS AND RECOMMENDATION

1  Tr. 415.

2      On October 18, 2007, Dr. Passmore wrote that Deinlein was

3  "under tremendous stress with finance/business," but had "no new

4  mania/or worsening depression."  Tr. 413.  He wrote that she was

5  "overall more stable than before," and they "discussed coping

6  strategy around family/business issues."  Tr. 413.

7      On January 29, 2008, Deinlein's husband accompanied her at her

8  appointment with Dr. Passmore.  She was experiencing "ongoing brief

9  manic irritable episodes."  Tr. 409.  They discussed medication

10  alternatives and settled on the addition of Abilify to Deinlein's

11  regimen.

12      Deinlein followed up with Dr. Passmore on February 4, 2008.

13  Tr. 407.  She had "no problems with Abilify, [but] little change in

14  [symptoms]."  Dr. Passmore advised her to increase the dosage of

15  Abilify.  Dr. Passmore observed that she had "ongoing symptoms" of

16  her bipolar disorder.

17      On March 12, 2008, Dr. Passmore reported that Deinlein

18  complained of "mixed feelings, depressed mood and loneliness with

19  anxiety during day."  Tr. 405.  She had "been down and anxious . .

20  . [and] crys when alone-isolated."  Id.  She did, however, feel

21  "less worried."  Id.  Deinlein had also been experiencing poor

22  sleep.  They discussed coping strategies and Dr. Passmore advised

23  her "to take a class or schedule outside activity."  Id.

24      Deinlein returned on March 21, 2008.  Dr. Passmore wrote that

25  she "Feels worse. More depressed.  Affect congruent."  Dr. Passmore

26  discussed her bipolar diagnosis with her as well as some coping

27  strategies.  They discussed Celexa, and he prescribed it at a low

28  dose.  Dr. Passmore told Deinlein he wanted to see her on a weekly

18 - FINDINGS AND RECOMMENDATION

basis until she improved.

Deinlein returned the following week on March 28, 2008.  Tr. 401.  She told Dr. Passmore that she had filled out a disability form with a lawyer.  They discussed her bipolar diagnosis further, and her prognosis for the future.  Dr. Passmore commented on Deinlein's "worsening anxiety about the future," and how it was "effecting concentration."  He noted that she had "loud, pressured speech.  She commented that she was "stressed by disability application and [had] fear of future problems with finances."  Dr. Passmore wrote that she said her mood was anxious, and her affect was irritable, but that she did not appear anxious.  He assessed that she did have worsening anxiety, and told her to come back in two weeks, and continue the medication.  After the appointment, Deinlein called and left Dr. Passmore a 5 minute message.  He noted in the chart: "congruent with the odd presentation? of axis II component?  Recommend neuropsych testing?"  Tr. 401.

Dr. Passmore next saw Deinlein on April 7, 2008.  Tr. 399. They discussed her diagnosis and medications.  She was having less anxiety about the future and feeling better.  Her mood was good. He instructed her to continue her current medications and encouraged her to get out more.

The same day, Dr. Passmore wrote a letter summarizing his treatment of Deinlein over the previous two and a half years, and his conclusions about her ability to be employed.  Tr. 423.  He wrote,

> She came into my practice with the diagnosis of Bipolar Disorder.  During the last three years she has been treated with Lithium for mood instability and Celexa for her depression, Temazepam for Insomnia, and Seroquel as needed for agitation.

19 - FINDINGS AND RECOMMENDATION

She has been mostly depressed during the last three years. During this time she had been working in her husband's business, but could only tolerate short periods of active employment. She was unable to work during times of stress and with even minor stresses, she becomes increasingly depressed and anxious to the point of not being able to function.. This appears [*sic*] is due to her mood instability and social isolation. Her periods of depression and the anxiety associated with her depression has made her unable to bring herself to leave the house for days at a time.

She has obtained some control of her symptoms with the medications listed above-to the point that she can function for months at a time and she has minimal problems with her activities of daily living. Unfortunately, only a partial remission has been achieved and she is unable to tolerate additional stresses. She easily decompensates, her mood instability interferes with her ability to consistently apply herself to any kind of employment. The medications have only helped to the extent that she has not needed to be hospitalized. She remains impaired enough to preclude employment.

Tr. 423.

## ALJ Hearing

On June 16, 2007, a social security benefits hearing was held before an ALJ. Tr. 428. Deinlein was represented at the hearing by her prior attorney Phyllis Burke. At the hearing Deinlein clarified that she never went to college, but that she went to vocational school for dental assisting. She worked as a dental assistant from the mid-1980s until 2003. Since that time, she "occasionally helped [her] husband with his business" designing and installing aquariums, and she did a temporary dental assignment, for two weeks, in 2006. She testified that the assignment was supposed to last longer, but "they did not ask me to come back for the last week." Tr. 429. Her husband had one full time employee, and two part-time employees, and Deinlein. When asked what she did to help with the business, Deinlein said she helped stuffing envelopes for billing and she occasionally answered the phone for

20 - FINDINGS AND RECOMMENDATION

him.   When asked about the details of her work arrangement, she
said that she does it "as I can, when I am able."   The ALJ asked
why Deinlein stopped working in 2003, and Deinlein responded, "my
problems with depressive episodes and manic episodes was just
becoming more frequent and more severe and longer in duration at
that time."   Tr. 431.   Deinlein described having bipolar symptoms
since she was a teenager.   Tr. 434.   In her younger years, she was
mostly manic, but as she got older, she had more depressive
episodes that began lasting longer and longer.

When the ALJ asked why Deinlein stopped seeing Larissa
Jeffreys and started seeing Dr. Passmore, Deinlein explained that
she "was going through a very severe depressive episode with
suicidal thoughts and tendencies and just was not responding at all
to the pharmaceutical treatment I was receiving so I was referred"
to Dr. Passmore.   Tr. 436.   The ALJ asked how it was going
generally.   Deinlein responded "very well," but when pressed about
what "very well" meant, she explained she still has periods when
she cannot get out of the house, and Dr. Passmore is more
responsive to her during severe depressive episodes. Tr. 436-7. He
helps "alleviate some of the discomfort of the depressive
episodes." Tr. 437.   The ALJ asked about how Deinlein's mother was
doing and discussed her father's death.   Tr. 438.   He asked if
Deinlein's illness was worse when her father died or when her
mother was going through difficult health problems.   Deinlein
responded, "I don't believe that it's become worse because of that,
you know."   Tr. 438.   The ALJ asked Deinlein about walking,
swimming, walking the dog, and doing ceramics, and the frequency of
those activities.   Tr. 438-40.   Deinlein explained that although

21 - FINDINGS AND RECOMMENDATION

for periods she might do those things frequently, those periods were sporadic. She explained that when she has a depressive episode, she will stay in bed for 18-20 hours a day and just get up to go to the bathroom, eat and not really do much else. Tr. 441. The ALJ asked Deinlein about her hobbies, and she talked about doing geocaching with her son off and on over the years. Tr. 442. Geocaching is an activity where you use a GPS device to go and find hidden trinkets throughout the city or remote areas. She said, however, she wouldn't be able to do it in a manic phase because she wouldn't be able tolerate the noisy, active environment of the city. Tr. 443. The ALJ pressed Deinlein and asked if she had ever tried. Deinlein said, "I have tried. I tried about two weeks ago when I was going through a manic state and just for about 20 minutes and put stuff away and left because I just couldn't get there and focus in on what I was doing." Tr. 443.

The ALJ asked Deinlein to describe her depressive state in detail. Tr. 447. Deinlein said, "It's just a feeling of just complete lack of energy and hopelessness and sadness and no interest in anything, kind of just outside of what I'm feeling right then. . . . I just don't feel like I can function at all." Tr. 447. The ALJ followed up by asking about the feelings and symptoms of a manic episode. Deinlein responded,

> The best word I can think of is 'fractured.' I can't, nothing can be sustained for any period of time. I could, I could be emptying the dishwasher and in the middle of emptying the dishwasher, all of a sudden feel compelled to go and iron clothes and then halfway through that, compelled to go and do something else and something else and by the end of the day, while I may be completely and totally exhausted, I have accomplished absolutely nothing.

Tr. 447-48. When people interact with her during a manic phase,

she said she feels "very irritable," and "it's difficult for me to even tolerate having someone try to have a conversation with me . . . . I feel angry like I'm, like just having them talk to me is being intrusive." Tr. 448. She testified this happened when she worked for her husband as well as when she was a dental assistant, that she wouldn't deal well with a customer, but wouldn't realize it until after the fact. The above is the full extent of Deinlein's testimony during the hearing.

On June 18, 2007, Deinlein's husband Robert submitted a letter for the ALJ's consideration. Tr. 250. Without reproducing the well-written letter in its entirety, I note that it is consistent with the rest of the evidence of record, and paints a clear picture of Deinlein's bipolar disorder. Mr. Deinlein notes his wife can function very well when she is in between manic and depressed, but cannot function at either end of the spectrum. He relates problems with allowing her to occasionally participate in the business. When manic, she is rude to potential customers, forgets to deliver messages, and begins tasks without completing them. When depressed, she cannot function at all, and that family has suffered dearly during these times. He noted they had cancelled Christmas plans with family two out of the last three Christmas holidays, and that he sometimes could not leave his wife home alone because of suicidal ideas.

## DISCUSSION

On appeal, Deinlein alleges the ALJ erred by (1) improperly rejecting the opinion of a treating physician, (2) failing to fully and fairly develop the record, (3) presenting a deficient hypothetical to the vocational expert, and (4) improperly failing

23 - FINDINGS AND RECOMMENDATION

1  to fully credit the plaintiff's subjective symptom testimony.
2  Deinlein asks that the court reverse the ALJ and remand for further
3  development of the record.

4  I.   Examining Physician Testimony

5       The weight given to the opinion of a physician depends on
6  whether the physician is a treating physician, an examining
7  physician, or a nonexamining physician.  More weight is given to
8  the opinion of a treating physician because the person has a
9  greater opportunity to know and observe the patient as an
10 individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If
11 a treating or examining physician's opinion is not contradicted by
12 another physician, the ALJ may only reject it for clear and
13 convincing reasons.  Id. (treating physician); Widmark v. Barnhart,
14 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if
15 it is contradicted by another physician, the ALJ may not reject the
16 opinion without providing specific and legitimate reasons supported
17 by substantial evidence in the record.  Orn, 495 F.3d at 632;
18 Widmark, 454 F.3d at 1066.  The opinion of a nonexamining
19 physician, by itself, is insufficient to constitute substantial
20 evidence to reject the opinion of a treating or examining
21 physician.  Widmark, 454 F.3d at 1066 n.2.  Opinions of a
22 nonexamining, testifying medical advisor may serve as substantial
23 evidence when they are supported by and are consistent with other
24 evidence in the record.  Morgan v. Commissioner of Social Security
25 Administration, 169 F.3d 595, 600 (9th Cir. 1999).

26      Here, Deinlein alleges the ALJ erred by failing to consider
27 the letter from Dr. Passmore, as well as other evidence in the
28 record from Dr. Passmore.  Dr. Passmore was Deinlein's treating

24 - FINDINGS AND RECOMMENDATION

physician for about two and a half years, beginning on October 24, 2005, which is well before the last date insured of December 31, 2006.

Giving the ALJ every benefit of the doubt, I am forced to concluded that Deinlein is correct that the ALJ failed to adequately consider evidence from Dr. Passmore. There is but a single sentence related to Dr. Passmore in the decision. It reads, "Medical records from Thomas Passmore, D.O., submitted after the hearing reveal the claimant has generally showed [*sic*] good response to medications, often with reports of no depression and no mania." Tr. 54. This is not an accurate characterization of the record with respect to Dr. Passmore's treatment of Deinlein. While Dr. Passmore's handwritten notes are difficult to read, they demonstrate that Dr. Passmore evaluated Deinlein as a woman who was not stable. For instance, on February 6, 2006, Dr. Passmore wrote the words, "feels very hypomanic," "irritable," and "day too much." Tr. 370. He noted she had "hypomanic" symptoms. Tr. 370. On September 14, 2006, Deinlein saw Dr. Passmore and he wrote she "feels hypomanic," and prescribed Zyprexa. Tr. 374. On the October 12, 2006 appointment with Passmore he wrote, "day a little better," and "stressed [illegible] sleep." Tr. 369. He also wrote "stressed [illegible] work," and "feels guilty." He opined that her "angry moods and stress [were] not worse than before– but not better." Tr. 369.

Although Dr. Passmore also sometimes wrote things like "doing better," and "feels ok," this is not sufficient to support an apparent rejection of the clear theme of Dr. Passmore's records without any stated reason. Such notations are more consistent with

25 - FINDINGS AND RECOMMENDATION

an episodic and brief improvement when read in context.

I find the ALJ failed to address important medical information from Dr. Passmore contained in the record.  I recommend remanding to the ALJ for further consideration.  Equally important, to the extent Dr. Passmore's records are illegible or his notes so short to be cryptic, the ALJ should develop the record in this regard. This will also allow the ALJ to consider the letter from Dr. Passmore written after the ALJ had reached his decision.  Failure to consider it, given its date, does not constitute reversible error, but it should be considered on remand for development of the record.  To the extent the notes from Deinlein's later visits to Dr. Passmore shed light on her earlier condition, they should be considered as well.

II.  <u>ALJ Duty to Develop the Record</u>

A Social Security ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation omitted).  The duty is heightened if a claimant is mentally ill and cannot protect her own interests.  <u>Id.</u>  The ALJ must supplement the record if:  (1) there is ambiguous evidence;  (2) the ALJ finds that the record is inadequate; or (3) the ALJ relies on an expert's conclusion that the evidence is ambiguous.  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005).  The supplementation can include subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow the record to be supplemented. <u>Tonapetyan</u>, 242 F.3d at 1150;  <u>Mayes v. Massanari</u>, 276 F.3d 453,

459-60 (9th Cir. 2001).

Here, the ALJ based his decision, in large part, on the records of Larissa Jeffreys. The Jeffreys records are ambiguous, however, about the limiting effects of Deinlein's bipolar illness. The complete records of two other treating physicians would be helpful to an ALJ in reaching a determination about the limiting effects of Deinlein's bipolar. I have already discussed, above, the benefit of allowing the ALJ to consider the letter written by Dr. Passmore as well as developing the record with regard to Dr. Passmore's illegible notes. Subpoenaing Dr. Passmore or sending him a questionnaire would also help develop the record.

In her Disability Report-Appeal, dated May 18, 2005, Deinlein specifically requested that the agency consider the records of her previous treater, Kim Delaney, who saw Deinlein from 1996 through 2003. Tr. 195. Deinlein provided the address of Delaney, and noted that she had already once requested assistance in obtaining the records for her disability claim, to no avail. Tr. 220.

Although in the typical situation the burden is on the claimant to ensure that all relevant information makes it into the record, here, where the evidence was ambiguous and the ALJ recognized that Deinlein is mentally ill, and where she asked for help, the ALJ had a duty to assist in the development of the record. The ALJ should have assisted in obtaining the Delaney records. New counsel for Deinlein also appears to be pursuing these records.

For all of the above reasons, I recommend reversing the decision of the Commissioner and remanding for further development of the record and reconsideration by an ALJ. The ALJ, with the

27 - FINDINGS AND RECOMMENDATION

cooperation of Deinlien's attorney, should take necessary steps to obtain and consider the Delaney treatment records, to consider Passmore's handwritten notes from before the hearing, and to consider Passmore's letter and notes from after the hearing. If treatment records exist, the ALJ should also obtain and consider Passmore's notes from December 2006 through August 2007. Consideration of a questionnaire or testimony from Passmore should also be given.

III. <u>Hypothetical to Vocational Expert</u>

Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant. <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1160 (9th Cir. 2001). A hypothetical that includes a residual functional capacity which incorporates the limitations and restrictions of the claimant, established by the record, is sufficient. See <u>id.</u>

Deinlein alleges the ALJ erred by presenting a deficient hypothetical to the vocational expert ("VE"), although Deinlein doesn't specify exactly what should have been different.

In the absence of any specific allegation about what should have been different in the hypothetical presented to the VE, I decline to engage in guesswork as to what error is being alleged. I note, however, that development of the record on remand may well reshape the VE hypothetical.

IV. <u>Subjective Symptom Testimony</u>

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be

expected to produce some degree of symptom.   Lingenfelter v.
Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).   The claimant is not
required to show that the impairment could reasonably be expected
to cause the severity of the symptom, but only to show that it
could reasonably have caused some degree of the symptom.   In the
second stage of the analysis, the ALJ must assess the credibility
of the claimant's testimony regarding the severity of the symptoms.
If there is no affirmative evidence of malingering, the ALJ may
reject the claimant's testimony "only by offering specific, clear
and convincing reasons for doing so."   Id.   Evidence of
malingering, however, by itself, is enough to discredit a claimant.
Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040.

        Here, the ALJ found that Deinlein's "statements concerning the
intensity, persistence and limiting effects of th[e] symptoms are
not entirely credible." Tr. 53.   The ALJ based this assessment on
certain records from Dr. Paladine and Jeffreys that indicated that
Deinlein   was   stable   and   her   illness   "well-controlled"   by
medications.   The ALJ noted that "although the claimant reported an
increase in symptoms in October 2004, treatment records reveal she
was experiencing grief related to situational factors, i.e. her
mother   entering   later   stages   of   cancer."    Tr. 53.    The   ALJ
continued by writing that the evidence of record about Deinlein's
"allegations of inability to work due to bipolar are inconsistent
with her reports of work activity in her husband's . . . business.
Treatment records reveal the claimant has reported that most of her
problems and stress are related to increased volume of work with
her husband." Tr. 54.   Finally, the ALJ writes that "the
claimant's credibility is also reduced by testimony at the hearing

29 - FINDINGS AND RECOMMENDATION

that she had not engaged in walking for one year is inconsistent with medical records dated March 22, 2007, which reveal she was walking on a daily basis four miles in one hour."  Tr. 54

Although there are instances in Jeffreys' records that refer to stability and the symptoms being controlled at times, taken as a whole, the Jeffreys records paint a different picture.  On the whole, the Jeffreys records show a patient who is constantly in flux, who regularly needs adjustments to her medications, and who needs help on a very regular basis in order to function.  For example, on March 31, 2004, Deinlein reported to Jeffreys "feeling in a hypomanic period," and that she "has only been sleeping 3-4 [hours] per night."  Tr. 290.  Jeffreys observed that Deinlien "sounds slightly giddy." Tr. 290.  On October 12, 2004, Deinlein spoke on the phone with Jeffreys and stated that "the periods of depression seem 'about the same' as they did [on August 23] visit, but . . . they're less severe and lasting only 1-2 days" at a time. Tr. 287.  On January 11, 2005, Deinlein visited with Jeffreys and reported that she had felt groggy since taking the Resperdal.  Tr. 286.  Deinlein reported that "she's not sleeping enough due to insomnia," and sleeps only four and a half hours per day.  Tr. 286. She was waking up at 4 a.m. and related that she was having more rumination and irritability, as well as increased distractibility. Jeffreys observed that Deinlein's mood was "anxious and dysthymic."

Deinlein's statements to providers about being stressed about her husband's business are not inconsistent with Mr. and Mrs. Deinlein's statements that she helped with the business when she was able, when she was in between manic and depressive states.  Her feeling of stress is not a statement that she spends, for example,

30 - FINDINGS AND RECOMMENDATION

20 hours per week working. Rather, it is a subjective feeling about her participation, whatever its level, at a particular moment in time. There is little doubt that Deinlein may be able to function at a relatively high level, and work occasionally, but the record indicates that she inevitably falls into either a manic or depressive episode, and becomes unable to function at that level in short order. Nothing in the record establishes how often or how many times Deinlein worked, including the sporadic statements to her treaters.

Moreover, Deinlein mentioned working just three times during over twenty visits with Jeffreys. At her intake interview with Jeffreys, on January 22, 2004, Deinlein reported "significant occupational stress" associated with assisting her husband with his aquarium maintenance business. Tr. 293. On April 21, 2004, Deinlein told Jeffreys that she was "overwhelmed" while involved in her husband's "brisk business." Tr. 290. She did not mention working again until July 7, 2004, when Deinlein related that "self-care is suffering" due to "work responsibilities." Tr. 288. Those three comments represent the entirety of Deinlein's comments to Jeffreys about her involvement with her husband's aquarium business. Three comments during a year and a half of treatment with Jeffreys are not inconsistent with Deinlein's alleged inability to work due to bipolar. Nor do the comments create a reason to find Deinlein not credible, or to find that most of her problems are related to work.

After reviewing those records, consulting psychologist Hennings suggested Deinlein "is working for her husband's aquarium design business." Tr. 327. This is grossly misleading.

31 - FINDINGS AND RECOMMENDATION

1    Passmore's cryptic and largely illegible records before the

2  hearing appear to mention work in the aquarium business only once

3  on October 12, 2006.  Tr. 369.  Post-hearing there are two such

4  references: September 10, 2007, Tr. 416, and October 18, 2007, Tr.

5  413.  This still leaves a record with at best six discrete

6  references to some limited involvement in Deinlein's husband's

7  business, each instance of which exacerbated her symptoms.  The

8  occurred over a 3 year and 10 month period.  This is an

9  insufficient reason to only partially credit Deinlein's testimony.

10    Finally, the ALJ's statement that "the claimant's credibility

11  is also reduced by testimony at the hearing that she had not

12  engaged in walking for one year is inconsistent with medical

13  records dated March 22, 2007, which reveal she was walking on a

14  daily basis four miles in one hour," is of little consequence.

15    Dr. Vorpahl did write in the chart on March 22, 2007, that she

16  "walks daily about 4 miles over an hour." Tr. 342.  At the hearing

17  four months later, the ALJ said,

18    ALJ: I've noted at various times you . . . walked four
     and a half miles at a time.  That's impressive.
19
     Deinlein: I have a very good friend who's been my best
20   friends for 40 years and is a nurse and understands my
     condition very well, who was extremely stubborn and
21   persistent in coming to my house and dragging me out, but
     when I was most active was during periods when I was in
22   a manic state.

23    ALJ: Were you ever doing that every day? I think it
     suggested that was a daily activity.  Was it ever daily?
24
     Deinlein: I don't believe it was ever daily.  We may have
25   done it two days in a row, but never for an extended
     period of time.
26
     ALJ: How long did you keep that up?
27
     Deinlein: For the longest period of time, I would say for
28   a week at a time, we would do it two to three times a

32 - FINDINGS AND RECOMMENDATION

week, maybe two weeks at a time and over the whole spectrum, it's been about a year since the last time we did that.

There are multiple ways to interpret this discrepancy. Most importantly, however, Deinlein's physical limitations played no part in her applications for disability. At the hearing, the ALJ asked, "but physically, do you think you could, if it weren't for the mental health issues, could you do at least some kind of work full time?" Tr. 450. Deinlein answered with an unqualified "Yes." She explained that she would have no problem being on her feet for part of the day.

Since Deinlein openly told the ALJ that she had no physical impairments that prevented her from working, and that she would have no problem being on her feet at work, an inconsistency about how far and how often she walked is not a reason to find Deinlein not credible.

I find the ALJ did not give specific, clear, and convincing reasons to find Deinlein less than fully credible.

## CONCLUSION

Accordingly, based on the record, the decision of the Commissioner should be reversed and remanded.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due May 26, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due June 13, 2011. When the response is due or filed, whichever date is earlier, the

33 - FINDINGS AND RECOMMENDATION

Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

                Dated this <u>6th</u> day of <u>May</u>, 2011.

                        /s/ Dennis J. Hubel

                        _____
                        Dennis James Hubel
                        United States Magistrate Judge

34 - FINDINGS AND RECOMMENDATION